IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON DIVISION

| | |
|---|---|
| Robert P. Smith, ) | |
| ) | Civil Action No. 8:15-3395-TMC-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| City of Anderson and ) | |
| James S. Stewart, ) | |
| ) | |
| Defendants. ) | |
| ) | |

       This matter is before the court on the defendants' motion for summary judgment (doc. 20). Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civil Rule 73.02(B)(2)(g) (D.S.C.), all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

## FACTS PRESENTED

       The plaintiff, who is a white male (doc. 1-1 at 14), was hired by the defendant City of Anderson's ("the City") former Police Chief, Martin Brown, who made the plaintiff an Internal Affairs ("IA") investigator (doc. 20-2, pl. dep. 17-20). Brown left the City in 2012. Shortly thereafter, the new Chief, James Stewart, reassigned the plaintiff to the Criminal Investigations Division ("CID") (*id.*). According to the plaintiff, Chief Stewart indicated that this was done because IA "was being too harsh in the performance of the duties" and IA had been "over investigat[ing] issues" (*id.* at 20). Upon his reassignment, the plaintiff's immediate supervisor was Captain Mike Walters (*id.* at 21). In a memorandum to Captain Walters regarding the plaintiff's reassignment, dated August 21, 2012, Chief Stewart stated that the plaintiff "is to have no involvement in Internal Affairs issues with the exception to clear up finished cases" (doc. 20-5).

       The plaintiff's partner was a Hispanic female named Janet Brock. In August 2013, Brock was assigned a case in which a woman's car (Lisa Parker) was towed by the

City. Parker made a complaint that money and medications were taken from her car (doc. 20-3). On August 9, 2013, the car was towed, after the complainant was involved in an accident and she was found to be driving without insurance. The initial incident report, dated August 12, 2013, states only that when Parker went to get her car out of the impound lot three days after her arrest she claimed $90.00 and some pills were missing from the vehicle (doc. 20-3). The incident report was taken by Officer Melissa Woodburn prior to the case being assigned to Brock and Smith (*id.*). Brock told the plaintiff about the assignment, and the plaintiff advised her that the case appeared to be an IA matter (doc. 20-2, pl. dep. 22-23). He advised Brock to ask if the matter should be referred to IA (*id.*).

On August 14, 2013, IA told Brock in an email to work the case, "and if the victim accuses an officer of taking her money then refer her to my office [IA]" (doc. 20-4). The plaintiff admitted in his deposition that as far as he and Brock knew, Parker had not yet accused an Anderson officer of any misconduct when he and Brock were assigned the case (doc. 20-2, pl. dep. 31, 48-49).

On August 14, 2013, the plaintiff and Brock interviewed Parker. According to the plaintiff and Brock's reports, Parker then accused the arresting officer of bruising her and failing to give her medical assistance (doc. 20-6 at 2; doc. 20-7 at 1). Both the plaintiff's and Brock's supplemental reports indicate that they told Parker the proper way to proceed was for her to file a complaint with IA (*id.*).

After the August 14 interview of Parker, Brock took no further investigative action. On August 15, 2013, the plaintiff asked crime scene technician Charlene Ezell to go with him to take photographs. Ezell told the plaintiff to get approval through Sergeant Oglesby (doc. 20-8 at 1). The plaintiff left the room, and when he returned, he told Ezell "something like 'It's all set,'" which Ezell took to mean that it had been approved (*id.*). According to Ezell, she asked the plaintiff twice where they were going, and he said only to meet him downstairs. The plaintiff eventually told Ezell it was an IA case that he planned to turn over after photos were taken. The plaintiff and Ezell met with the plaintiff, and Ezell took photos of Parker's injuries (*id.* at 2). Ezell reported that the plaintiff repeatedly

2

encouraged Parker to file an IA complaint and kept saying that "officer stealing" was taken "very seriously" (*id.*). When Ezell returned to her station, she learned that Sergeant Oglesby did not know anything about where Ezell had been and that Brock had turned the case over to IA the day before (*id.*).

According to the plaintiff, Brock did not accompany him on August 15th because "something came up with one of her kids or something at school" (doc. 32-1, pl. dep. 38).  In his deposition, the plaintiff did not specifically recall from whom he received approval to take Ezell with him to meet Parker:

> [Sergeant Oglesby] may have been in the office, but if she wasn't in the office, you know, I went to somebody.  I think I said, I kind of remember going to Captain Walters.  If she says there was - she asked me about Oglesby, maybe she did.  But I'm telling you at the end of the day I feel strongly that it was Walters that I ultimately went to. . . .

(Doc. 32-1, pl. dep. 41).

The following day, August 16, 2013, the plaintiff entered the photos into the evidence system, and then he began checking the bodycam videos of the officers involved in arresting Parker (doc. 20-7 at 2). He did not find any videos in the system and checked back on some of the officers' records over the past six months, noting that some had no bodycam videos in the system (*id.*).

On October 11, 2013, the plaintiff was disciplined for continuing the investigation after the point when it was clear it was an IA matter and contrary to his instructions when he was reassigned to CID.   In the letter of disciplinary action, Chief Stewart noted that he personally discussed with the plaintiff over the telephone the issue of the plaintiff having no involvement in IA affairs upon his reassignment to CID, and Captain Walters discussed the August 2012 memo regarding the matter with the plaintiff in person (doc. 20-11 at 1-2; *see* doc. 20-5).  The plaintiff was demoted to the rank of Patrolman and reassigned to the Patrol Division and given a final warning (doc. 20-11). The plaintiff filed a grievance over the discipline, but the City's Employee Grievance Committee

upheld Chief Stewart's decision and found that the plaintiff had engaged in insubordinate behavior (doc. 20-9).

Following this incident, the plaintiff applied for an open position with the South Carolina Law Enforcement Division ("SLED"). SLED made a conditional offer of employment to the plaintiff on the condition that he successfully complete a polygraph examination, fingerprinting, background investigation, and psychological examination (doc. 32-4). As part of the background investigation, SLED interviewed Chief Stewart on February 6, 2014. According to the SLED report, Stewart stated that the plaintiff "had some disciplinary actions in his personnel file. He was not liked by his peers and co-workers" (doc. 32-6). The plaintiff ultimately did not get the job with SLED (doc. 32-1, pl. dep. 64).

The plaintiff filed a charge of discrimination against the City with the Equal Employment Opportunity Commission ("EEOC") in February 2014 (doc. 20-17).[1]

On June 19, 2014, a City prosecutor reported that the plaintiff had failed to show up for court in two jury trials on June 18, 2014. She stated as follows:

> City. v. Antonio Strong, CDV. Both the offender and the victim appeared and had to wait a while and were told to come back. Officer Robert Smith did not appear for court at all. He did sign for the notices.
>
> City v. Mary Allice McCombs, CDV. The offenders attorney appeared, but the victim did not. Officer Robert Smith did not appear for court at all. He did sign for the notices. The victim is also charged with CDV by another officer (Zickler). As the victim did not appear and has not cooperated with the victim advocate, I nolle prossed that one due to the failure to prosecute on the part of Officer Smith.
>
> It's bad enough when they don't bring me DUI case files or video, but when there are victims, it is even worse.

(Doc. 20-12). The plaintiff had been informed of the dates of these trials and signed notices informing him of the dates he should appear (doc. 20-13). When asked about his absences,

---

[1] The defendants provided a copy of the notice of charge (doc. 20-17), but neither party has provided a copy of an actual charge of discrimination.

the plaintiff claimed that the dates were confusing on the first case. With respect to the second case, he admitted he had no excuse (doc. 20-14). In his deposition, the plaintiff noted that supervisors typically again notify officers of court dates, and "Lieutenant Scott acknowledged all of this. He said, I know this isn't your fault. He's like, I got you covered on this, nothings going to come of this" (doc. 32-1, pl. dep. 68).

Following the email from the prosecutor, Chief Stewart terminated the plaintiff's employment. His decision was reviewed and affirmed by the City.

According to the plaintiff's complaint, he filed a charge of discrimination with the EEOC, and a notice of right to sue was thereafter issued on June 2, 2015 (doc. 1-1 at 15).[2]

In his complaint, which was filed in state court on June 22, 2015, and removed to federal court on August 25, 2015, the plaintiff alleges causes of action for breach of contract/covenant of good faith and fair dealing against the City; for race discrimination against Stewart under 42 U.S.C. § 1981; pursuant to 42 U.S.C. § 1983 for denial of due process in retaliation for filing a grievance against Stewart; for defamation *per se* against Stewart; for race, gender, and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, against the City; for retaliation in violation of Title VII against the City; and for wrongful discharge in violation of public policy against the City (doc. 1-1).

The defendants filed their motion for summary judgment on August 1, 2016. The plaintiff filed a response in opposition on September 1, 2016 (doc. 32), and the defendants filed a reply on September 18, 2016 (doc. 35). A hearing on the motion for summary judgment was held before the undersigned on January 12, 2017.

---

[2] A copy of the charge has not been provided to the court.

**APPLICABLE LAW AND ANALYSIS**

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

***Breach of Contract/Breach of Covenant of Good Faith and Fair Dealing***

In the first cause of action alleging breach of contract and breach of the covenant of good faith and fair dealing against the City, the plaintiff cites City Ordinance Section 54-11, which, as quoted by the plaintiff, requires police officers to "be vigilant and active in the enforcement of the provisions of this Code and other ordinances of the city and the laws of the state" (doc. 1-1 at 10). It further requires officers to obey the rules, regulations, and orders of their superior officers and the City Manager (*id.*). The plaintiff alleges that the "non-retaliation provision of the grievance policy and the aforementioned ordinance wasn't a 'vague promise.' Rather, it was a specific, written promise of Defendant not to retaliate against Plaintiff and constitute an enforceable contract that was breached" (*id.* at 11).

In South Carolina, employment is presumed to be at-will, meaning that an employee may be terminated any time, for any reason, with or without cause. *Hessenthaler v. Tri–County Sister Help, Inc.*, 616 S.E.2d 694, 697 (S.C. 2005) (citations omitted). "The issue of whether an employee handbook constitutes a contract should be submitted to the jury when the issue of the contract's existence is questioned and the evidence is either conflicting or is capable of more than one inference." *Watkins v. Disabilities Bd. of Charleston Cnty.*, 444 F. Supp.2d 510, 514 (D.S.C. 2006). However, a court should resolve whether the employee handbook constitutes a contract as a matter of law when the employee handbook's policies and disclaimers, taken together, establish that an enforceable promise does or does not exist. *Id*. While an employee handbook may create an employment contract, it does so only when: "(1) the handbook provisions and procedures in question apply to the employee; (2) the handbook sets out procedures binding on the employer; and (3) the handbook does not contain a conspicuous and appropriate disclaimer." *Bishop v. City of Columbia*, 738 S.E.2d 255, 259 (S.C. Ct. App.

7

2013) (citations omitted).  South Carolina Code Annotated Section 41-1-110 provides as follows:

> It is the public policy of this State that a handbook, personnel manual, policy, procedure, or other document issued by an employer or its agent after June 30, 2004, shall not create an express or implied contract of employment if it is conspicuously disclaimed. For purposes of this section, a disclaimer in a handbook or personnel manual must be in underlined capital letters on the first page of the document and signed by the employee. For all other documents referenced in this section, the disclaimer must be in underlined capital letters on the first page of the document. Whether or not a disclaimer is conspicuous is a question of law.

S.C. Code Ann. § 41-1-110.

Here, the City's policies and disclaimers, taken together, establish that an enforceable promise does not exist. The City's employee handbook contains a disclaimer that is underlined and in capital letters stating that the recipient acknowledges that the handbook is not an employment contract and that his employment is at-will (doc. 20-15). The plaintiff signed the disclaimer (*id.*).  The City's employee grievance procedure also includes a disclaimer that is underlined and in capital letters, stating that the policy does not alter an employee's at-will employment status (doc. 20-16).  In his deposition, the plaintiff testified that he understood his employment was at-will (doc. 20-2, pl. dep. 19). In his opposition to the motion for summary judgment, the plaintiff does not address the defendants' arguments as to the contract cause of action (*see generally* doc. 32).  However, at the hearing, the plaintiff's attorney argued that the claim has not been abandoned and that the City's disclaimer was not included on the first page of the handbook.  No evidence in support of this argument was presented to the court.

The City ordinance cited by the plaintiff in the complaint concerns a police officer's general duties, such as the obligation to enforce the ordinances of the City. It says nothing about the grievance system. General statements of obligations, or of the law, do

not create an exception to at-will employment. *See, e.g., Hessenthaler*, 616 S.E.2d at 698. The ordinance does not mention the grievance policy at all and contains no promises, much less promises regarding employment. While the plaintiff alleges in the complaint that the "non-retaliation provision of the grievance policy . . . wasn't a 'vague promise,'" he has failed to present any evidence whatsoever in support of this allegation. Moreover, the undersigned has reviewed the grievance policy submitted by the defendants and has found no such provision (*see generally* doc. 20-16). As the plaintiff has failed to raise an issue of material fact as to the existence of a promise made by the City that altered the at-will relationship, summary judgment should be granted on the first cause of action.[3]

*Title VII and Section 1981 Discrimination*

In the second cause of action, the plaintiff alleges a claim under 42 U.S.C. § 1981 against Chief Stewart, alleging that Stewart "conspired to deprive [the plaintiff] of his constitutional right to contract (employment) based upon [the plaintiff's] race" (doc. 1-1 at 11-12). In the fifth[4] cause of action, the plaintiff alleges a claim against the City for gender, race, and national origin discrimination in violation of Title VII (*id.* at 14-15). As the claims require the same proof, they will be analyzed together.

A plaintiff may avoid summary judgment on a discrimination claim under Title VII through two avenues of proof: by "presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision," or by relying on the *McDonnell*

---

[3]As the plaintiff has not shown he had a contract, his claim for breach of the implied covenant of good faith and fair dealing also fails. *See Williams v. Riedman*, 529 S.E.2d 28, 40 (S.C. Ct. App. 2000) (declining to apply this covenant to the employment at-will situation where no contract exists); *Keiger v. Citgo, Coastal Petroleum, Inc.*, 482 S.E.2d 792, 794 (S.C. Ct. App.1997) (affirming trial judge's dismissal of cause of action for breach of implied covenant of good faith and fair dealing where employee failed to allege in her complaint that her at-will employment status had been altered).

[4]The plaintiff mistakenly labels both his defamation *per se* and Title VII causes of action as the "Fourth Claim" (doc. 1-1 at 13-14).

*Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden-shifting framework. *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir.2004), recognized as abrogated on other grounds, *Foster v. Univ. of Md.–E. Shore*, 787 F.3d 243 (4th Cir. 2015)).

Here, the plaintiff is proceeding under the *McDonnell Douglas* framework, under which a plaintiff must first establish a *prima facie* case. *Hill*, 354 F.3d at 285. "It is settled that the *McDonnell Douglas* framework applies to a § 1981 claim." *Tshibaka v. Sernulka*, No. 15-1839, 2016 WL 7229820, at *5 (4th Cir. Dec. 13, 2016) (citation omitted). To establish a *prima facie* case of discrimination in the context of disparate discipline, a plaintiff must show: (1) he is in a protected class; (2) the conduct he engaged in was similar to persons outside his class; and (3) the discipline against him was more severe. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011) (citations omitted). *See Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985) (recognizing that elements of *prima facie* Title VII claim and *prima facie* § 1981 claim are identical).

The plaintiff seeks to establish a *prima facie* case of discrimination by pointing to a Hispanic female, Brock, as a comparator. He claims that he and Brock "BOTH investigated the Parker case, both learned at the same time about her allegations, and both continued the investigation, [although] Plaintiff was the only one disciplined. Plaintiff's comparator is Janet Brock (Hispanic female)" (doc. 32 at 9). However, the undisputed evidence before the court does not support the plaintiff's argument. While the plaintiff and Brock both initially investigated the Parker case, there is absolutely no evidence that Parker continued the investigation after August 14, 2013. The plaintiff, however, on August 15th, took a crime scene technician with him to take photographs of Parker (doc. 20-8 at 2). While the plaintiff claims Brock did not accompany him on August 15th because "something came up with one of her kids or something at school" (doc. 32-1, pl. dep. 38), the fact remains that she did not continue the investigation while the plaintiff did. On August 16,

2013, the plaintiff continued the investigation by entering the photographs into the evidence system, and then he began checking the bodycam videos of the officers involved in arresting Parker (doc. 20-7 at 2). The plaintiff has failed to show that a similarly situated person outside his protected class was treated more favorably under similar circumstance such that an inference of discrimination is raised.

Even if the plaintiff could establish a *prima facie* case of discrimination, the defendants have articulated a legitimate, nondiscriminatory reason for the adverse employment action taken against the plaintiff. *Hill*, 354 F.3d at 285. Specifically, the defendants contend that the plaintiff was demoted to the rank of Patrolman and reassigned to the Patrol Division and given a final warning for continuing the investigation after the point when it was clear it was an IA matter and contrary to his instructions when he was reassigned to CID (doc. 20-11).

Once the employer meets this burden, "the *McDonnell Douglas* framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Hill*, 354 F.3d at 285 (alterations in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000)). The plaintiff must present evidence that "'demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination.'" *Diamond*, 416 F.3d at 318 (quoting *Hill* 354 F.3d at 285). A plaintiff could accomplish this goal "by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

In response to the motion for summary judgment, the plaintiff argues that the defendants have "never showed" or "failed to prove" that Brock turned the investigation over to IA on August 14th and that Captain Walters "was not in the loop as claimed by [the plaintiff]" (doc. 32 at 9-10). Importantly, to survive summary judgment, the plaintiff must demonstrate that specific, material facts exist that give rise to a genuine issue. *Celotex,* 477

11

U.S. at 324. Assuming these facts in a light most favorable to the plaintiff, he has failed to show that the proffered reason for the adverse employment action was pretext for discrimination. Even if Brock did not turn the investigation over to IA on the 14th and Captain Walters knew that the plaintiff was going to see Parker on the 15th, the fact remains that the plaintiff continued to investigate an IA matter while Brock did not, and whether she failed to do so by luck or deliberately makes no difference. Importantly, "[i]t is the perception of the decisionmaker which is relevant." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217 (4th Cir. 2007). Here, the plaintiff has failed to put forth sufficient evidence that the defendants' proffered explanation is unworthy of credence and that discrimination upon the basis of race, gender, or national origin was the real reason behind the plaintiff's demotion. Based upon the foregoing, summary judgment should be granted to the defendants on the plaintiff's Section 1981 and Title VII causes of action.[5]

***Title VII Retaliation***

In his sixth cause of action, the plaintiff alleges that the City terminated his employment in retaliation for the filing of a charge of discrimination and a grievance regarding his demotion (doc. 1-1 at 16-17). He further alleges that the City provided a falsely negative reference to SLED in retaliation for the filing of the EEOC charge and grievance (*id.*). To establish a *prima facie* case of retaliation, a plaintiff must demonstrate: (1) he engaged in a protected activity; (2) his employer took an adverse employment action against him; and (3) there was a causal link between the two events. *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008) (citation omitted).

The plaintiff began the grievance process with the City on October 16, 2013 (doc. 20-9 at 5), and he filed an EEOC charge in February 2014 (doc. 20-17). He was

---

[5]The defendants raise additional arguments in support of dismissal of the Section 1981 claim (*see* doc. 20-1 at 12-15) that will not be addressed as the undersigned finds summary judgment is appropriate on the same basis as the Title VII discrimination claim.

terminated from employment in June 2014. The court will assume for purposes of this motion that the plaintiff can establish a *prima facie* case based upon the temporal proximity between the EEOC charge and his termination from employment. "The Fourth Circuit Court of Appeals has held that 'very little evidence of a causal connection is required to establish a prima facie case' and the closeness in time between the protected activity and an employer's adverse employment action is sufficient to satisfy the causation element of a prima facie retaliation case." *See, e.g.,Kemp v. United Parcel Service, Inc.*, C.A. No. 1:14-4840-JMC, 2016 WL 5539517, at *7 (D.S.C. Sept. 30, 2016) (citing *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 443 (4th Cir. 1998); *Williams v. Cerberonics, Inc.*, 871 F.2d 452 (4th Cir. 1989) (holding three-month time period between protected activity and termination sufficient to satisfy the causation element of the prima facie case of retaliation); *Carter v. Ball*, 33 F.3d 450 (4th Cir. 1994) (finding causal link between filing of retaliation complaints and the plaintiff's demotion five months later)).

Even assuming the plaintiff can establish a *prima facie* case, the undersigned agrees with the defendants that the plaintiff has failed show that the defendants' proffered reason for terminating his employment - he missed two jury trials - was pretext for discrimination or retaliation. Other than the fact the plaintiff filed an EEOC charge and he was terminated some four months later, the plaintiff has presented absolutely no evidence supporting his claim of retaliation. The plaintiff's missed court dates were reported to the City by an independent party (doc. 20-12). The plaintiff admitted he missed the court dates, and he can point to no one who was treated differently. In fact, City records show at least one other employee who committed the same offense, was similarly situated, and was treated the same. Officer Rory Bell was also on final warning when he missed court resulting in the dismissal of two cases. As a result, he was terminated (doc. 20-18).

With regard to the plaintiff's claim that the defendants provided a "falsely negative reference to SLED" in retaliation for the filing of the EEOC charge and grievance

13

(doc. 1-1 at 16), the plaintiff's evidence consists only of a SLED investigative report stating that an agent interviewed Chief Stewart and "obtained the following information . . . [that the plaintiff] had some disciplinary actions in his personnel file. He was not like[d] by his peers and co-workers" (doc. 32-6). As argued by the defendants, such evidence is inadmissible hearsay that cannot be used to support an assertion that a fact is genuinely disputed. *See* Fed. R. Civ. P. 56(c), Fed. R. Evid. 801, 803, 804. The plaintiff has not responded to this argument (*see generally* doc. 32).

For the foregoing reasons, the City is entitled to summary judgment on the plaintiff's Title VII retaliation claim.

### *Section 1983*

The third cause of action is brought pursuant to 42 U.S.C. § 1983 against Chief Stewart, alleging that Chief Stewart retaliated against the plaintiff for exercising his grievance rights in violation of the plaintiff's right to due process (doc. 1-1 at 12-13). The plaintiff claims he was terminated at the end of June 2014 because he filed a grievance concerning his demotion in October 2013.

> To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny.

*Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir.2001). As discussed above in regard to the plaintiff's discrimination and retaliation claims, the plaintiff has failed to make the required showing.

Further, as argued by the defendants (doc. 20-1 at 13-15), such a claim has been analyzed by the Fourth Circuit Court of Appeals as both First Amendment Free Speech and First Amendment right "to petition the Government for a redress of Grievances"

claims. *Kirby v. City Of Elizabeth City, N. Carolina*, 388 F.3d 440, 448 (4th Cir. 2004). Under either, to be protected, the speech or petition must involve a matter of public concern. *Id*. at 448 ("It would violate the principles articulated in *McDonald* and *Thorne* to extend constitutional protection of public employees' petitions for redress beyond the protections afforded to public employee speech.").

The plaintiff's grievance concerned whether or not he improperly continued the Parker investigation after the point where it should have been handed over to IA and whether the punishment fit the disciplinary action (doc. 20-9). First, as argued by the defendants, there is no allegation in the complaint that the plaintiff's demotion was a matter of public concern. The demotion of one officer for failure to follow proper procedure and instructions is simply not a matter of public concern. *See, e.g., Arvinger v. Mayor of Baltimore*, 862 F.2d 75, 78–79 (4th Cir. 1988) (holding that employee's testimony at hearing in co-employee's sexual discrimination case was not public concern because it did not address a public debate over employment discrimination); *Gearhart v. Thorne*, 768 F.2d 1072, 1073 (9th Cir. 1985) ("[The plaintiff's] grievances related only to refuting false charges of his ineptitude, allegedly brought in retaliation for his actions, including his grievances. These are 'matters only of personal interest,' and do not invoke first amendment protection."). Even if in his grievance the plaintiff had raised issues of discrimination, allegations directed towards the plaintiff's own individual grievances he is alleged to have personally suffered have been held not to be an a matter of public concern. *See Howze v. Virginia Polytechnic*, 901 F. Supp. 1091, 1099-100 (W.D. Va. 1995) (citations omitted).

Based upon the foregoing, Chief Stewart is entitled to summary judgment on this claim.

### *Defamation Per Se*

In his fourth cause of action, the plaintiff alleges a claim for defamation *per se* against Chief Stewart (doc. 1-1 at 13-14). A party asserting a claim of defamation must

prove the following elements: "(1) a false and defamatory statement was made; (2) the unprivileged publication of the statement to a third party; (3) the publisher was at fault; and (4) either the statement was actionable irrespective of harm or the publication of the statement caused special harm." *Williams v. Lancaster Cty. Sch. Dist.*, 631 S.E.2d 286, 292 (S.C. Ct. App. 2006).

The plaintiff claims that Stewart defamed him by allegedly telling SLED, in the context of a job reference, that he had "some disciplinary actions in his personnel file" and "was not like[d] by his peers and co-workers" (doc. 32-6). As a preliminary matter, neither Stewart nor anyone from SLED has been deposed in this matter. The report, therefore, constitutes hearsay and cannot support his defamation claim. *See, e.g.,TLT-Babcock, Inc. v. Emerson Elec. Co.*, 33 F.3d 397, 401 (4th Cir. 1994) (alleged statements of others in a memorandum are hearsay even though "the document itself may be admissible under the business records exception"); *Sumter v. Jenny Craig, Inc.*, No. 3:14-CV-4460-CMC-SVH, 2016 WL 3397588, at *3 (D.S.C. June 21, 2016) (statements as to what someone was told are inadmissible hearsay and do not support defamation claim). The plaintiff does not address this issue in the response to the motion for summary judgment (*see generally* doc. 32). As the plaintiff has only presented hearsay evidence of a publication, defendant Chief Stewart is entitled to summary judgment on this claim.

Furthermore, the South Carolina Tort Claims Act grants immunity to governmental employees acting within the scope of their employment unless the conduct constitutes actual fraud, actual malice, intent to harm, or a crime involving moral turpitude. S.C. Code Ann. 15-78-70(a), (b). *See Smith v. Ozmint*, 394 F. Supp. 2d 787, 792 (D.S.C. 2005) (state employee can, in these limited circumstances, be held personally liable by a federal court only for some intentional torts committed within the scope of his employment); *Roberts v. City of Forest Acres*, 902 F. Supp. 662, 671 (D.S.C.1995) (finding that the governmental entity is not liable under the Act, and the employee is personally liable, only

when the employee's conduct falls within the exceptions listed in § 15-78-70(b)); *Antley v. Shepherd*, 532 S.E.2d 294, 299 (S.C. Ct. App. 2000) (governmental manager cannot be held personally liable for a discharge in violation of public policy when he is acting within the scope of his duties). "The provisions of [the Act] establishing limitations on and exemptions to the liability of the State, its political subdivisions, and employees, while acting within the scope of official duty, must be liberally construed in favor of limiting the liability of the State." S.C. Code Ann. § 15–78–20(f).

The evidence before the court shows that the SLED investigator interviewed all of the plaintiff's past employers and asked the same questions (*see* doc. 20-10). Chief Stewart (allegedly) answered, in response to these questions, that the plaintiff was not liked and had some disciplinary issues. He did not go beyond these very brief responses. There is absolutely no evidence that Chief Stewart was acting outside the scope of his employment and no evidence that his conduct constituted actual malice nor intent to harm. Accordingly, the claim is barred by the South Carolina Tort Claims Act.

Based upon the foregoing, summary judgment should be granted to the defendants on this cause of action.

*Wrongful Discharge in Violation of Public Policy*

In his last cause of action, the plaintiff alleges a claim for wrongful discharge in violation of public policy against the City (doc. 1-1 at 17-18). He alleges that the defendants "were prohibited from retaliating against Plaintiff for filing a grievance regarding his wrongful demotion and for exercising his rights thereunder" (*id.* at 17).

Under the "public policy exception" to the at-will employment doctrine, an at-will employee might have a cause of action in tort for wrongful termination where there is a retaliatory termination of the at-will employee in violation of a clear mandate of public policy. *Ludwick v. This Minute of Carolina, Inc.*, 337 S.E.2d 213 (S.C. 1985). However, the exception does not apply when "the employee has an existing remedy for a discharge that

allegedly violates rights other than the right to the employment itself." *Epps v. Clarendon Cty.*, 405 S.E.2d 386, 387 (S.C. 1991). As argued by the defendant (doc. 20-1 at 26-27) and as discussed above, courts have recognized a cause of action under Section 1983 against an employer who retaliates against a public employee who pursues a grievance. *See Lawson v. Gault*, C.A. No. 7:13-1050-TMC, 2013 WL 2010224, at *1 (D.S.C. May 13, 2013) (finding that plaintiff had existing remedy under § 1983 and thus wrongful discharge claim was barred). The plaintiff has not addressed this issue in the response in opposition to the motion for summary judgment (*see generally* doc. 32).

In response to the motion, the plaintiff cites only his oath to execute his duties as a law enforcement officer, and he then infers that one of those duties is to insure officers wear body cameras (doc. 32 at 12-13). As argued by the defendants in reply (doc. 35 at 3), this is quite a leap, particularly in light of the fact that neither the plaintiff's discipline nor his discharge have been tied to his review of the bodycam records of other officers. The plaintiff does not even provide any evidence regarding an alleged body-cam requirement.

Based upon the foregoing, summary judgment should be granted on this cause of action.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the defendants' motion for summary judgment (doc. 20) should be granted, and this case should be dismissed.

IT IS SO RECOMMENDED.

s/Kevin F. McDonald
United States Magistrate Judge

January 20, 2017
Greenville, South Carolina